**William ARAMONY, Plaintiff,**

**v.**

**UNITED WAY OF AMERICA, individually and as administrator and named fiduciary under the United Way of America Replacement Benefit Plan and United Way Supplemental Benefits Agreement, Defendants.**

**No. 96 Civ. 3962(SAS).**

United States District Court,
S.D. New York.

July 7, 1997.

Michael Bailey, Dennis W. Houdek, Falcone, Houdek, Bailey & Curd, L.L.P., New York City, for Plaintiff.

Elise M. Bloom, Jennifer B. Courtian, Jackson, Lewis, Schnitzler & Krupman, New York City, Paul Ondrasik, Jr. Sara E. Hauptfuehrer, Steptoe & Johnson, L.L.P., Washington, DC, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff William Aramony ("Aramony") moves to dismiss the counterclaim served an

January 15, 1997 by defendant United Way of America ("UWA").[1] UWA moves for the return of privileged documents produced to Aramony. For the reasons set forth below, Aramony's motion is granted in part and denied in part and UWA's motion is granted.

## I. LEGAL STANDARD FOR MOTION TO DISMISS

In deciding a Rule 12(b)(6) motion, the court must accept as true material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). Such a motion cannot be granted simply because recovery appears remote or unlikely on the face of a complaint, as "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)), *cert. denied,* —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996)) (internal quotation marks omitted). Rather, dismissal can only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686.

## II. BACKGROUND

Plaintiff Aramony is the former President and Chief Executive Officer of United Way of America ("UWA"), a not–for–profit organization chartered in New York and headquartered in Alexandria, Virginia. *See* Counterclaim ¶¶ 1–2. UWA acts as a service organization for approximately 1,400 local United Way organizations across the country. *Id.*

In late 1991 and early 1992, a series of newspaper articles reported that plaintiff had improperly benefitted from his position at United Way. The principal allegations fo-

cused on plaintiff's expenses and alleged failure to reimburse UWA for personal items. In response to those reports, UWA's Board of Governors retained the law firm of Verner, Liipfert, Bernhard, McPherson and Hand Chartered ("Verner, Liipfert") and The Investigative Group, Inc. ("IGI") to investigate and prepare a written report of their findings. That report, furnished to the board on April 2, 1992, alleged poor management and haphazard expenditures under Aramony's stewardship. *Id.* ¶¶ 4–5.

Aramony was fired in March of 1992, and following further investigations by the Department of Justice, Aramony was indicted in September of 1994 and convicted in June of 1995 of 25 counts of mail fraud, wire fraud, interstate transportation of fraudulently–obtained property, money laundering, filing false tax returns, and aiding in the filing of false tax returns by a federal jury in the Eastern District of Virginia. Aramony is currently incarcerated in a federal correctional facility. *Id.* ¶ 8. Following a separate investigation by the Attorney General of the State of New York, a civil action was commenced against Aramony alleging breach of fiduciary duty under New York Not–for–Profit Corporations Law § 720 (McKinney 1997) ("IN–PCL"). That action is still pending. *Id.* ¶ 10.

Aramony commenced this action on May 24, 1996, seeking recovery under a series of retirement benefit plans which he had entered into while still employed by UWA. After UWA's motion to dismiss the complaint was granted in part and denied in part, *see Aramony v. United Way of America,* 949 F.Supp. 1080 (S.D.N.Y.1996), UWA filed and served an answer and counterclaim on January 15, 1997. Aramony filed this motion to dismiss UWA's counterclaim pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c).

In the midst of this litigation, on August 23, 1996, Aramony's counsel Michael Bailey served a First Request for Production of Documents on UWA. In response, UWA and UWA's counsel Verner, Liipfert, Bernhard,

---

**1.** The counterclaim alleges (1) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., (2) breach of contract, (3) breach of covenant of good faith and fair dealing, (4) breach of common law fiduciary duty, (5) breach of fiduciary duty under New York's Not–for–Profit Corporations Law (N–PCL), and (6) common law fraud.

McPherson and Hand produced 210 boxes (630,000 pages) of documents.[2] Steptoe & Johnson, Verner, Liipfert's co–counsel, conducted a review of the documents over an eleven–week period beginning on September 16, 1997. See Declaration of Eric G. Serron, Steptoe & Johnson attorney ("Serron Dec.") at ¶ 4. Three attorneys, joined by a fourth in the sixth week of the inspection, and three paralegals participated in the document review. *Id.* A total of 324.1 hours of attorney time and 445.4 hours of paralegal time was spent reviewing documents and facilitating production. *See* Declaration of Sara E. Hauptfuehrer of Steptoe & Johnson ("Hauptfuehrer Dec.") at ¶¶ 4, 6.

Bailey reviewed the documents at the Verner, Liipfert offices on several different dates and selected 68,500 pages for copying. *Id.* at ¶ 11. In October and November 1996, an outside copy service produced two copies, sending one directly to Bailey and the other to Steptoe. *Id.* On May 12, 1997, approximately six months later, Steptoe received a letter from Bailey indicating that certain documents covered by a claim of attorney–client privilege or work product protection had been included in the materials produced. *Id.* at ¶ 13. Specifically, Steptoe asserts that ninety–nine pages of documents are privileged and were inadvertently produced. See Letter from Hauptfuehrer to Bailey, dated June 10, 1997; Letter from Hauptfuehrer to the Court, dated June 19, 1997. Among the documents is the memo, drafted by Verner, Liipfert for UWA, outlining the parties' respective claims, the merits of those claims and the likelihood of success if Aramony sued UWA. On May 13, 1997, Steptoe demanded return of the memo via a letter faxed to Bailey. Here, Steptoe also demands the return of the remainder of the privileged documents.[3]

### III. ARAMONY'S MOTION TO DISMISS

#### A. RICO

##### 1. Timeliness

Aramony argues that UWA's RICO counterclaim is timebarred because it fails to allege any cognizable RICO injury falling within the appropriate statute of limitations period. The following questions must be answered in order to evaluate that argument: (1) what is the statute of limitations; (2) when does it begin to run; (3) when is the period tolled if a RICO violation is alleged in a counterclaim; and (4) whether UWA alleges RICO injuries occurring within the appropriate period.

 Although no statute of limitations is explicitly set forth in the RICO statute, the Supreme Court has held that civil RICO actions are subject to the four–year period contained in § 4B of the Clayton Act. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). It was not until this term, however, that the Supreme Court considered what events trigger the accrual of that period. *See Klehr v. A.O. Smith Corp.*, —— U.S. ——, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). While holding that the Third Circuit's "last predicate act" rule of accrual is wrong, the Supreme Court declined to resolve the more troublesome circuit split on whether a plaintiff's lack of knowledge of his injury can forestall accrual of the limitations period.[4] *Id.* at ——, 117 S.Ct. at 1991–92. As a result, the Second Circuit's "injury discovery" rule (also endorsed by the First, Fourth, Fifth, Seventh, and Ninth Circuits) controls: the period accrues on the date on which the plaintiff first "knows or has reason to know of the injury that is the basis for the action." *Cullen v.*

---

**2.** The documents were located in the offices of Verner, Liipfert because of an earlier document production to the U.S. Attorney who was prosecuting Aramony.

**3.** Aramony does not assert that the documents are not privileged. He only asserts that the privilege was waived.

**4.** Justice Scalia authored a concurring opinion in *Klehr* chiding the majority's evasion of the dis-

covery issue and suggesting that knowledge of injury is inapposite: "the appropriate accrual rule is the Clayton Act 'injury' rule—the 'cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.' *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 [91 S.Ct. 795, 806, 28 L.Ed.2d 77] (1971)." *Klehr*, —— U.S. at —— ——, 117 S.Ct. at 1991–92.

*Margiotta,* 811 F.2d 698, 725 (2d Cir.1987). Under this rule, a plaintiff "may sue for any injury he discovers or should have discovered within four years of the commencement of his suit, regardless [of] when the RICO violation causing such injury occurred." *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1103 (2d Cir.1988); *see also Bingham v. Zolt,* 66 F.3d 553, 560 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1418, 134 L.Ed.2d 543 (1996):

> A necessary corollary of the separate accrual rule is that a plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought. As long as separate and independent injuries continue to flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries within the four-year "window" before suit was filed.

(citations omitted). Thus, UWA's RICO claim can only stand if it was brought within four years of when UWA discovered or should have discovered a sustainable RICO injury; and if so, UWA can only recover for those injuries discovered or discoverable within that same period.

■ In order to define the actual dates of this period, a determination must be made as to when the period ended. Under Fed. R.Civ.P. 13, a counterclaim tolls its limitations period at the filing of the initial complaint if it is compulsory, but not until the service of the counterclaim if it is permissive. *See Employers Ins. of Wausau v. United States,* 764 F.2d 1572, 1576 (Fed.Cir.1985) (citing *Burlington Indus., Inc. v. Milliken & Co.,* 690 F.2d 380, 389 (4th Cir.1982)). The operative language in Rule 13 defines compulsory counterclaims as those which arise from "the transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(a). While other circuits consider evidentiary overlap, potential

res judicata problems, and similarity of facts and law in determining whether a counterclaim arises out of the same transaction or occurrence as the initial complaint, this circuit inquires whether a "logical relationship" exists between the claims, and whether "the essential facts of the claims are 'so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.' " *Adam v. Jacobs,* 950 F.2d 89, 92 (2d Cir.1991) (quoting *United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979)); *see also Harris v. Steinem,* 571 F.2d 119, 123 (2d Cir.1978).[5]

The most recent "logical relationship" decision by this Circuit discussed a series of Truth–in–Lending Act (TILA) cases where the counterclaims were ultimately declared permissive. The Court of Appeals pointed out that the opposing claims required different legal analyses: "The borrower need only show that the loan documents do not comply with specific federal regulations. By contrast, the bank must show a breach of contract. A lender's claim for debt against a borrower who sues for violation of TILA has none of the characteristics associated with a compulsory counterclaim." *Adam,* 950 F.2d at 93.

This reasoning is applicable to the present case. While a RICO counterclaim against an ERISA complaint may not always be permissive, Aramony's ERISA claims will require an evaluation of Aramony's performance of his employment agreements, whereas UWA's RICO claim requires a different and more complex analysis of how Aramony's wrongful acts constituted racketeering activity under 18 U.S.C. § 1962(c).

■ UWA had four years to file its RICO claim from the time it learned of Aramony's untoward conduct in early 1992. UWA's RICO claim in no way depends on the resolution of Aramony's ERISA claims, and involves completely different law. According-

---

**5.** In their efforts to resolve this relation back question, both parties spent considerable portions of their briefs debating whether UWA's counterclaim was recoupment (always compulsory) or a set–off (always permissive). Because the RICO counterclaim is based on completely different law than that applicable to Aramony's claims

for benefits, and because the counterclaim seeks affirmative relief which is not allowed by either a set–off or recoupment, this issue need not be resolved. *Compare McCoy v. Goldberg,* 845 F.Supp. 155, 159 (S.D.N.Y.1994) (citing *Distribution Serv., Ltd. v. Eddie Parker Interests, Inc.,* 897 F.2d 811, 812 (5th Cir.1990)).

ly, UWA's counterclaim is permissive and suspends the RICO limitations period on the date it was served, namely January 15, 1997.[6] UWA's RICO counterclaim may only go forward if UWA discovered or should have discovered cognizable RICO injuries within four years of that date, namely after January 15, 1993.

### 2. Cognizable RICO Injuries

■ Neither party disputes that UWA was injured by Aramony when he misappropriated funds on various occasions prior to 1991, and that UWA learned of those injuries by April 1992. But the only injuries relevant to this claim are those which UWA purports to have suffered at Aramony's hands after January 15, 1993: losses of dues from member organizations; losses of charitable contributions from the general public; and losses of legal, accounting and consulting fees spent mitigating reputational damage. See RICO Statement ¶¶ 15–17.[7] None of these losses were concealed and UWA knew of them as soon as they occurred.

■ Under Title 18 U.S.C. § 1964(c), a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima S.P.R.L. v. Imrex,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). In order to establish a cognizable RICO injury, a plaintiff must show not only that the defendant's alleged RICO violation was the "but–for" or cause–in–fact of his injury, but also that the violation was the legal or proximate cause. *See Holmes v. S.I.P.C.,* 503 U.S. 258, 265–68, 112 S.Ct. 1311, 1316–18, 117 L.Ed.2d 532 (1992). Failure to adequately allege a cognizable RICO injury is grounds for dismissal at the pleading stage. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 772 (2d Cir.1994); *Burdick v. American Express Co.,* 865 F.2d 527, 528 (2d Cir.1989).

■ A plaintiff's prior expenditure on legal fees is only a sustainable RICO injury where defendant's underlying wrongful acts contemplate the victim responding in court. See *Stochastic Decisions, Inc. v. DiDomenico,* 995 F.2d 1158, 1167 (2d Cir.1993) (incurring legal fees was RICO injury where predicate acts included preventing plaintiff's collection efforts on outstanding judgment); *Bankers Trust v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988) (plaintiff suffered RICO injury by paying attorneys' fees defending frivolous lawsuits started by defendant and designed to forestall collection of an outstanding bankruptcy claim); *Capasso v. CIGNA Ins. Co.,* 765 F.Supp. 839, 842–43 (S.D.N.Y.1991) (where plaintiff alleged fraudulent divorce proceedings, "it cannot reasonably be suggested that the harm contemplated by the alleged fraudulent scheme was an increase in [plaintiff's] attorneys' fees").

UWA cites *Philatelic Found. v. Kaplan,* No. 85–8571, 1986 WL 5629 (S.D.N.Y., May 9, 1986) for the proposition that fees expended investigating a defendant's underlying fraudulent scheme are sustainable RICO injuries. *Philatelic* relies on a broad interpretation of *Sedima,* where the Supreme Court "cautioned against a restrictive reading of the type of injury recoverable under RICO." *Id.* at *10. But whatever inferences the *Philatelic* court drew from *Sedima* in 1986 have been clarified and narrowed by the proximate cause requirement which *Holmes* added in 1992. See 503 U.S. at 268, 112

---

**6.** The accrual of the statute of limitations may be offset by equitable estoppel if the defendant fraudulently concealed his wrongful acts, *see Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2d Cir.1979); *Wolin v. Smith Barney, Inc.,* 83 F.3d 847, 851 (7th Cir.1996), and if the plaintiff exercised due diligence in discovering that concealment. *See Klehr,* —— U.S. at ——, 117 S.Ct. at 1993. UWA alleges that "[f]rom January 1990 to March 1992, Aramony engaged in a series of acts designed to conceal his criminal activities from UWA." Counterclaim at ¶ 21. Even taken as true for the purposes of resolving this motion, this fraudulent concealment took place too early to effect the timeliness of UWA's RICO counterclaim. More than four years elapsed between the last alleged concealment in March 1992 and the service of the counterclaim in January 1997.

**7.** All parties asserting civil RICO claims must file and serve upon the opposing party a RICO Statement explicitly setting forth the numerous elements required by the Act. See Individual Rules & Procedures (SAS) 5.

S.Ct. at 1317. To that extent, *Philatelic* is no longer good law.

Relying on *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256 (2d Cir.1995), UWA argues that its expenditure of fees to mitigate reputational damages constitutes a cognizable RICO injury. In that case, the Court of Appeals let stand a jury's finding that plaintiff suffered damages including $150,000 in lost profits, $100,000 in out-of-pocket expenses, and $100,000 in "injury to reputation and/or loss of goodwill." *Id.* at 262. While *Securitron* does indicate that damage to a company's reputation can comprise a sustainable RICO injury, it does not create a *per se* rule that reputational damage always constitutes RICO injury. The plaintiff in *Securitron* succeeded because the underlying predicate acts included deliberate and fraudulent misrepresentations designed to malign the plaintiff's reputation in the marketplace as a lock manufacturer. *See id.* at 258–62. The damage contemplated by the predicate acts was reputational injury to the plaintiff, thus fulfilling the proximate cause requirement of *Holmes.*

The nexus between the predicate acts and the alleged reputational damage in this case is far more tenuous. UWA's RICO allegations relate exclusively to Aramony's efforts to spend UWA's money on various personal extravagances and his subsequent efforts to conceal that spending. To satisfy *Holmes,* UWA would have to allege that the reputational damage it suffered in the wake of Aramony's malfeasance, and after Aramony's termination, was the intended result of Aramony's embezzlement scheme. It does not. On the contrary, it appears from the pleadings that UWA's timely injuries were merely a result of the public's mistrust of UWA's remaining management and the poor oversight record of UWA's board. See Counterclaim at ¶¶ 23–32.

■ Under the *Holmes* proximate cause requirement, losses suffered due to the public's unintended response to separately actionable misconduct are not sufficient RICO injuries in their own right. This conclusion is supported by *In re American Express Company Shareholder Litigation,* 39 F.3d 395 (2d Cir.1994). There, the Court of Appeals distinguished between the actual commission of the RICO violations and the subsequent exposure of those acts as the proximate cause of the plaintiff's injuries.

> The injuries alleged thus were neither the preconceived purpose nor the specifically intended consequence of the RICO defendants' acts. Moreover, any losses ... were caused only because the scheme itself was exposed ...

*Id.* at 400. Losses of fees spent mitigating unintended reputational damage are not actionable RICO injuries.

UWA does not allege cognizable RICO injuries occurring within four years of the service of this permissive counterclaim. Accordingly, Aramony's motion to dismiss UWA's RICO counterclaim is granted.

**B. Breach of Contract**

■ Aramony contends that UWA's breach of contract claim should be dismissed because it seeks to recover punitive damages which are not available for breach of contract. Without deciding whether punitive damages are appropriate here, Aramony's motion is denied because UWA also seeks compensatory damages which are available under this claim.

**C. Breach of Covenant of Good Faith and Fair Dealing**

■ Aramony contends that UWA's breach of covenant of good faith and fair dealing claim should be dismissed because it seeks to recover damages duplicative of those sought under UWA's RICO claim. Because the RICO claim is dismissed, Aramony's motion to dismiss this claim is denied.

**D. Breach of Common Law Fiduciary Duty**

■ Aramony contends that under New York's borrowing statute, C.P.L.R. § 202, Virginia's one year limitations period bars UWA's breach of common law fiduciary duty counterclaim. This Court looks to the statute of limitations of the forum state, including its borrowing statute, in determining the length of the limitations period. *See Arneil*

*v. Ramsey,* 550 F.2d 774, 779 (2d Cir.1977); *F.D.I.C. v. Cohen,* No. 95 Civ. 683, 1996 WL 87248, at *3 (S.D.N.Y. February 29, 1996).

In 1992, New York enacted a special statute of limitations for crime victims suing their malefactors:

> Notwithstanding any other limitation set forth in this article ... an action by a crime victim, or representative of a crime victim, ... may be commenced to recover damages from a defendant convicted of a crime which is the subject of such action, for any injury or loss resulting therefrom within seven years of the date of the crime.

C.P.L.R. § 213–b (West 1997 Supp.). The borrowing statute, part of the "article" mentioned in § 213–b, is supplanted by this seven–year crime victims limitations period. *See* C.P.L.R. § 213–b, Practice Commentary at 115 (West 1997 Supp.).

Because UWA alleges breaches of fiduciary duty occurring within seven years of the service of its counterclaim, Aramony's motion to dismiss this claim is denied.[8]

### E.  Breach of Fiduciary Duty under New York Not–for–profit Corporation Law

■ UWA asserts a counterclaim under § 720 of the New York N–PCL seeking to compel Aramony to account for his management of corporate assets and for the transfer, loss, or waste of corporate assets in violation of his duties. See Counterclaim at ¶ 63. Aramony contends that UWA has no standing to sue because the New York State Attorney General has already filed the same claim against Aramony and only one of the two may bring an action under § 720(b).[9] No case law has been found conclusively resolving this question. The "plain meaning" of the statute, set forth in the margin, evinces no obvious answer.

The only sustainable relief that UWA seeks under § 720 is to compel Aramony to account for his actions. Even if Aramony were to lose both this claim and the same claim brought by the attorney general, the only duplicative penalty he could suffer is two accountings. Duplicative accountings, unlike damage awards, are inherently redundant rather than cumulative. Providing an accounting to one plaintiff, having already provided the same accounting to another, requires at most the costs of photocopying and postage. Moreover, the legal costs of defending a second N–PCL action having already defended a first on the identical issue are marginal. Because Aramony will not be prejudiced in any way by UWA's prosecution of this claim, his motion to dismiss is denied.[10]

### F.  Common Law Fraud

■ UWA's common law fraud claim is not time barred to the extent that it alleges acts occurring after January 15, 1990 for the same reasons set forth above in part III(D).

■ Aramony also argues that UWA failed to plead allegations of fraud with suffi-

---

**8.** I note without deciding that UWA may be barred from recovering for any breach which occurred prior to January 15, 1990, depending on whether New York's relation back rule, C.P.L.R. § 203(d), or the federal relation back rule, Fed.R.Civ.P. 13, applies to this claim. This choice of law problem is one which falls squarely within the scope of–the *Erie* doctrine. Under *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), when a state law conflicts directly with a Federal Rule of Civil Procedure, "the Court has been instructed to apply the Federal Rule, and can refuse to do so only if the advisory Committee, [the Supreme] Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions." *Hanna,* 380 U.S. at 471, 85 S.Ct. at 1144. Unlike conflicts with federal procedure promulgated under the Rules of Decision Act, conflicts with Federal Rules are not subject to the "outcome determinative" test of *Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 108–12, 65 S.Ct. 1464, 1469–71, 89 L.Ed. 2079 (1945). *See Hanna,* 380 U.S. at 472, 85 S.Ct. at 1144–45. To ascertain the scope of Aramony's potential breach of fiduciary duty liability, the parties will at some point have to undergo a similar relation back analysis to that set forth above with respect to Aramony's RICO claim.

**9.** "An action may be brought for the relief provided in this section and in paragraph (a) of section 719 (Liability of directors in certain cases) by the attorney general, by the corporation, or, in the right of the corporation, by any of the following: ..." N–PCL § 720(b).

**10.** If the Attorney General's state court action reaches a judgment before this action, collateral estoppel may preclude further litigation in this Court.

cient particularity in violation of Fed.R.Civ.P. 9(b). A pleading must be sufficiently particular to serve the three goals of Rule 9(b): (1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 584 (S.D.N.Y.1995).

■ Aramony, an incarcerated felon, cannot now claim reputational damage from a civil fraud claim based on the same events for which he was convicted. Nor is this counterclaim a strike suit. The only way Aramony can win his motion on this claim is if the counterclaim fails to provide him with fair notice of the claims against him. To that end, allegations which fail to specify the time, place, speaker and, in some cases, the contents of the misrepresentations, lack the "particulars" required by Rule 9(b). *See Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986). Moreover, to plead a claim for fraud under New York law, a plaintiff must allege: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by that reliance. *See May Department Stores Co. v. International Leasing Corp.,* 1 F.3d 138, 141 (2d Cir.1993).

UWA's allegations of fraud are set forth in ¶ 21 of the counterclaim and list eight events which occurred "from January 1990 to March 1992." Counterclaim at ¶ 21. No specific dates, locations, contents, or subject matters are included, and no specific reliance by or damages to UWA are averred. Reading the counterclaim alone, Aramony is left to guess as to what misrepresentations are alleged.

However, when considering the pleadings, the exhibits annexed to the pleadings, the RICO Statement, and the briefs on this motion, UWA does provide Aramony with the particularity required by Rule 9(b). UWA must amend its counterclaim to provide those details in the proper form, but assuming UWA does so within 10 days of the issuance

of this opinion, Aramony's motion to dismiss this counterclaim will fail.

## IV. PRIVILEGED DOCUMENT PRODUCTION

### A. General Principles

■ If a party voluntarily discloses a document, it waives any claim of attorney-client privilege and cannot later seek to keep the document confidential. *See Carter v. Rosenberg & Estis, P.C.,* No. 95 Civ. 10439, 1996 WL 695866, at *2 (S.D.N.Y. Dec.4, 1996) (citing *In re von Bulow,* 828 F.2d 94, 101 (2d Cir.1987)). Generally, however, inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel was so careless as to suggest that it was not concerned with the protection of the asserted privilege. *See Desai v. American International Underwriters,* No. 91 Civ. 7735, 1992 WL 110731, at *1 (S.D.N.Y. May 12, 1992).

■ In *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985), this Court articulated several factors in determining whether the alleged inadvertent disclosure should result in waiver. The elements which go into that determination include the reasonableness of the precautions taken to prevent inadvertent disclosure; the time taken to rectify the error; the scope of the discovery; the extent of the disclosure; overriding issues of fairness.

### B. Application of the *Lois Sportswear* Factors to UWA's Documents

#### 1. Reasonableness of the Precautions to Prevent Inadvertent Disclosure

■ The inspection of 210 boxes (630,000 pages) of documents occurred over an 11-week period, involving three attorneys (joined by a fourth in the sixth week of the inspection) and three paralegals. See Serron Dec. at ¶ 4. During the months of September, October and November 1996, the attorneys and paralegals spent a combined total of 769.5 hours (324.1 attorney hours; 445.4 paralegal hours) reviewing the documents. *See* Hauptfuehrer Dec. at ¶¶ 4, 6.

The Serron Declaration describes the document review procedures. In the initial re-

view, senior associates removed any document that was subject to a claim of attorney–client privilege or work product protection, put the document in a separate folder identifying the box from which it was removed, and placed the folder in a separate location for further consideration or inclusion in a privilege log after all boxes had been reviewed by at least one attorney or paralegal. *See* Serron Dec. at ¶ 8.

The paralegals and junior associate also participated in the initial review. Serron described to them the basic principles of attorney–client privilege and the work product doctrine and explained how to identify potentially privileged documents. In the initial review, the paralegals and junior associate flagged documents potentially subject to privilege and placed such documents in boxes on one side of the room for subsequent review by one of the senior associates. *Id.* at ¶¶ 7, 9. Documents that were not flagged were not reviewed by the senior associates.

After the attorneys and paralegals had reviewed all 210 boxes of documents, each flagged document was reviewed again by a senior associate to determine whether it was subject to a claim of attorney–client privilege or work product protection. *Id.* at ¶ 10. If the senior associate determined that a flagged document was subject to privilege, the document was then placed in a separate location for yet further consideration or inclusion in a privilege log. *Id.* Boxes that were ready to be produced to Bailey were labeled with a "post-it" note and stacked separately. *Id.*

Bailey's claim that Steptoe failed to conduct a document–by–document review for relevance and responsiveness is directly refuted by one of the attorneys who participated in the inspection. According to the declaration of Eric T. Werner, "each of the documents in each of the boxes of material previously produced to the U.S. Attorney was reviewed for *responsiveness and privi-*

*lege* prior to its presentation for examination by Mr. Aramony's attorneys." Declaration of Eric T. Werner, Verner, Liipfert attorney, at ¶ 6 (emphasis added).

Steptoe acknowledges, however, that it neglected to review the documents again following Bailey's selection before the copy service sent the documents to Bailey. See Memorandum of Law in Support of Motion Seeking Return of Privileged Material at 9. Bailey also contends that Steptoe decided not to compare the documents it produced with the documents listed on its privilege log. Affidavit of Michael Bailey ("Bailey Aff.") at ¶ 8.

In *Lois Sportswear*, the Court found that the inspection by Levi, the producing party, only just protected its privilege:

> Levi apparently had no practice of designation of confidential documents at the time of origination. There is no statement as to any general instructions given to the reviewers [paralegals] other than to segregate documents 'of that kind [privileged].'

*Id.* at 105. The Court held that the disclosure of twenty–two privileged documents out of 16,000 pages reviewed and 3,000 requested was inadvertent rather than voluntary.

Further, in *Lloyds Bank PLC v. Republic of Ecuador*, No. 96 Civ. 1789, 1997 WL 96591, at *4 (S.D.N.Y. March 5, 1997), the Court found an inspection of approximately 10,000 pages of documents adequate in which two attorneys spent more than fifty hours reviewing the documents once for responsiveness and once for potential privilege. The attorneys inadvertently produced fifty privileged documents comprising 227 pages.

Here, the document review conducted by Steptoe involved more extensive and rigorous procedures than those employed in *Lois Sportswear*. Although the review was not conducted solely by attorneys, as in *Lloyds Bank*, the enormous amount of material inspected [11]—over sixty times the number of

---

11. Although Bailey contends that Steptoe maximized the number of documents it produced in an attempt to overwhelm his firm, Bailey's broad First Request for Production of Documents undermines this claim. Bailey's document request includes 35 paragraphs of separate requests for productions, such as "all documents that refer or

relate to investigations by UWA of the conduct of William Aramony" (¶ 21) and "all documents that refer or relate to termination of or resignation by William Aramony" (¶ 28). Furthermore, Bailey's document selection indicates that Steptoe's massive production was warranted. The total number of pages of documents *selected* by

pages in *Lloyds Bank*—warranted the assistance of paralegals.[12] Notwithstanding Steptoe's failure to conduct additional reviews after Bailey's document selection, an extended inspection involving 769.5 hours of review by four attorneys and three paralegals over an eleven–week period is adequate. The disclosure, as in *Lois Sportswear* and *Lloyds Bank*, was inadvertent and a mistake rather than a knowing waiver. It would be inappropriate for the client of producing counsel to suffer the waiver of privilege, absent any apparent prejudice to the opposing party, due to an isolated, inadvertent error. *See Lloyds Bank*, 1997 WL 96591, at *5. Additionally, while the total number of documents was large (630,000 pages), the number of allegedly privileged documents is a small fraction of the whole.

## 2. The Time Taken to Rectify the Error

■ The period after the producing party realizes that privileged information has been disclosed is the relevant period for measuring whether the privilege has been waived. *See Georgia–Pacific Corp. v. GAF Roofing Mfg. Corp.*, No. 93 Civ. 5125, 1995 WL 117871, at *2 (S.D.N.Y. March 20, 1995). At approximately 4:00 p.m. on May 12, 1997, a Steptoe attorney received a copy of a letter from Bailey indicating that privileged documents had been made available to him. *See* Hauptfuehrer Dec. at ¶ 13. Later that same afternoon, Steptoe attorneys met to discuss the matter and drafted a letter which was faxed to Bailey the next day, May 13, 1997, demanding return of the materials. *Id.* In *Lloyds Bank*, 1997 WL 96591, at *4, no waiver was found when producing counsel took immediate steps to assert the privilege

Bailey (68,500) is comparable to the total number of pages of documents *reviewed* in *Lois Sportswear, Lloyds Bank,* and *Martin v. Valley National* combined (approximately 76,000).

12. The facts are unclear as to whether the documents were produced from the materials reviewed only by the paralegals and junior associate or from the materials re-reviewed by the senior associates. However, the use of paralegals and a junior associate here was warranted, and a senior associate explained to each of them how to conduct the review. Furthermore, although there were four copies of the memo among the documents reviewed, only one was inadvertently disclosed.

as to the disclosed documents. Counsel sent a letter the next day to opposing counsel requesting return of the disputed documents.

Steptoe's response is similar to that made by producing counsel in *Lloyds Bank*, and a request for the return of the privileged material within twenty–four hours of learning of the inadvertent production weighs against a loss of privilege. *See also Georgia–Pacific Corp.*, 1995 WL 117871 (producing party's response within two business days of learning of inadvertent production did not constitute a waiver)

## 3. The Scope of the Discovery and Extent of Disclosure

This factor seeks to compare the "scope of the discovery with the amount of the privileged or protected material disclosed." *Martin v. Valley Nat'l Bank of Arizona*, 89 Civ. 8391, 1992 WL 196798, at *3 (S.D.N.Y. Aug.6, 1992). The 630,000 pages of documents produced in response to Bailey's first request, along with the 68,500 pages of documents selected suggests that the scope of discovery was quite broad. Yet, the ninety–nine pages of disputed documents, including the fifty–one page memo, again is a small fraction of the production.[13] In *Lois Sportswear*, the Court held that the accidental disclosure of twenty–two documents, out of 16,000 pages inspected, and out of 3,000 requested did not constitute a waiver. *Id.* at 105. Additionally, in *Lloyds Bank*, the Court found no waiver of privilege when producing counsel inadvertently disclosed 227 pages of documents from approximately 10,000 pages inspected. *Id.* at *4.

13. Steptoe originally asserted privilege with respect to an additional 115 pages of documents inadvertently produced to Bailey. However, 114 pages of these documents were produced to the U.S. Attorney in connection with Aramony's criminal conviction, and a one–page letter was produced to Aramony's criminal attorney. Steptoe no longer asserts a privilege as to these 115 pages. Even if privilege were asserted, however, the total number of pages inadvertently produced (214) would still not result in a waiver of that privilege.

In light of this precedent, the relatively small amount of privileged material disclosed here, as compared to the massive amount of material produced, weighs against waiver of privilege. *See also Martin,* 1992 WL 196798 (finding disclosure of five documents out of 50,000 pages reviewed and 25,000 pages selected did not result in waiver).

### 4. Overriding Issues of Fairness

Although Steptoe claims the memo is of no probative value, Bailey maintains that the memo challenges UWA's defenses to Aramony's claims for pension benefits. Bailey Aff. at ¶ 13. Bailey intends to use the memo in support of plaintiff's summary judgment motion. *Id.* at ¶ 10. However, it is difficult to discern how Bailey may properly use the memo. This document is a private communication between UWA and its counsel. The memo merely provides a legal opinion to UWA and does not represent UWA's position as of January 1993 (the date the memo was presented to UWA) or now, over four years later and after Aramony became a convicted felon. In addition, UWA did not adopt its counsel's statement. It is highly unlikely that Aramony would be able to use the memo at all and would suffer no prejudice by returning UWA's memo.

## V.  CONCLUSION

Aramony's motion to dismiss is granted with prejudice with respect to UWA's RICO claim and denied with respect to the remaining claims. UWA has until July 17, 1997, to serve and file an amended counterclaim properly stating its allegations of fraud in accordance with Fed.R.Civ.P. 9(b).

The application of the *Lois Sportswear* factors demonstrates that Steptoe was sufficiently careful in its document review and thus did not waive any privilege. Steptoe's extensive review procedures and immediate response to learning of the inadvertent disclosure belie any suggestion of carelessness. For the reasons stated above, defendant's motion for the return of privileged documents is granted.

SO ORDERED.