65 F.3d 256
 RICO Bus.Disp.Guide 8884, 42 Fed. R. Evid. Serv. 1388
 SECURITRON MAGNALOCK CORP., Plaintiff-Appellee,
v.
Charles SCHNABOLK, Kalon Systems, Inc. and Andra Systems,
Inc., Defendants-Appellants.
Charles SCHNABOLK, Kalon Systems, Inc. and Andra Systems,
Inc., Counter-Claimants,
v.
SECURITRON MAGNALOCK CORP., Counter-Defendant.
 No. 1531, Docket 94-9194.
 United States Court of Appeals,
Second Circuit.
 Argued May 4, 1995.
Decided Sept. 7, 1995.
 
 David Jaroslawicz, New York City (Robert J. Tolchin, Jaroslawicz & Jaros, of counsel), for defendants-appellants-counter-claimants.
 Nathaniel H. Akerman, New York City (Bernard A. Solnik, Seyfarth, Shaw, Fairweather & Geraldson, of counsel), for plaintiff-appellee-counter-defendant.
 Before: MINER, JACOBS and CABRANES, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Defendants-appellants Charles Schnabolk, Kalon Systems, Inc. ("Kalon") and Andra Systems, Inc. ("Andra") appeal from a judgment entered in the United States District Court for the Southern District of New York (Buchwald, M.J.) awarding damages in the total amount of $1,050,000, attorney's fees in the sum of $284,134 and costs of $58,847 and enjoining them from engaging in deceptive acts and practices. The judgment followed a jury verdict favorable to plaintiff-appellant Securitron Magnalock Corp. ("Securitron") under the Racketeer Influenced and Corrupt Organization Act ("RICO"), the New York General Business Law and the New York law of defamation. We affirm in all respects.
 
 BACKGROUND
 
 2
 Based on the evidence, the jury could have found the following.I. The Parties.
 
 
 3
 Securitron is a manufacturer of electromagnetic locks and relating locking system equipment. Electromagnetic locks are devices that lock doors by using electricity to generate a magnetic field. The lock manufactured by Securitron is known as the Magnalock, and it is sold in most part to security equipment wholesalers who in turn sell to installing companies. Securitron also sells accessory products for the Magnalock such as power supplies, entrance controls and releasing devices.
 
 
 4
 Kalon is in the business of installing security equipment, and Schnabolk was its owner and President at all times relevant to this litigation. In 1988, Osborne Frazier, a former Security Director for the Newark, New Jersey School System, was the Vice President in charge of marketing. Kalon never had more than six permanent employees during the period in question.
 
 
 5
 Andra is in the business of manufacturing alarm systems, electromagnetic locks and related items. Its electronic lock is known as the Andralock, and Schnabolk was its principal owner until May 1, 1989, when he sold his controlling interest to undisclosed individuals. Schnabolk was Vice President of this corporation and, at least at some point, one Louie Delisio was President. Frazier also was a Vice President of Andra, which apparently had no other employees. Kalon and Andra shared office space at 74 Warren Street in New York City.
 
 
 6
 II. Communications to the Bureau of Standards and Appeals.
 
 
 7
 At all relevant times, the New York City Bureau of Standards and Appeals ("BSA") was the only city agency having jurisdiction to approve materials, including electromagnetic locks, for use in city construction projects. The Magnalock has been approved by the BSA since September, 1980. On August 2, 1988, Schnabolk wrote on Kalon stationery to BSA Commissioner Raymond Lawrie, stating that the Magnalock had " 'shorted' into a locked position on numerous occasions," that the Magnalock "failed our laboratory test when we applied the 1000 volt test" and that Kalon "currently [has] a contract to remove these locks from a Newark school because of the shorting/failure problem." In fact, there was no evidence that the Magnalock ever shorted into a locked position, and a short in the system would result in the lock remaining open instead of closed in any event. Also, there was no evidence of the failure of a "1000 volt test" or of the existence of a contract with the Newark schools to remove any locks. After making the foregoing misrepresentations, Schnabolk concluded his letter to Commissioner Lawrie by asking him to "review th[e] Securitron application and let me know if they are to retain their [BSA] listing."
 
 
 8
 On June 16, 1989, Schnabolk wrote to Kathleen A. Carney, Executive Director of the BSA, on stationery bearing the heading "Institute for Security Design." In that letter, Schnabolk reiterated his allegation regarding "the potential danger that [the Securitron Magnalock] creates when used in fire safety situations." He also stated that he had been informed by Underwriters Laboratories ("UL") that the Securitron locking system had failed certain tests and that the Securitron lock was not on the UL approved list. Both statements were false. Schnabolk concluded his letter to Ms. Carney by suggesting that it would be "in the best interests of all concerned" if Securitron were removed from the BSA approved list.
 
 
 9
 III. Communications With and Concerning UL.
 
 
 10
 Since 1984, the Securitron Magnalock has been included on the UL approved list. Certain end users of electromagnetic locks apparently required UL listing for the locks they employ. On October 13, 1988, Schnabolk wrote a letter to UL on Andra stationery, falsely representing that the Securitron lock had "shorting problems." UL promised to investigate but, because no action was taken, Schnabolk wrote again on June 20, 1989 in his capacity as Executive Director of the Institute for Security Design and as Andra President. In this letter he noted that the Securitron Magnalock "poses a potentially life-threatening situation" because of its "tendency to 'ground' into a locked position when it should be 'opened.' " Schnabolk threatened UL that he would expose its inaction in lectures and publications and would attempt to have UL removed from the BSA approved list of testing laboratories.
 
 
 11
 UL continued to approve the Magnalock, and Schnabolk made good on his threats. In September 1989 he spoke before the American Society of Industrial Security at Nashville, Tennessee. In his speech he said that UL is "the greatest fraud in America," that it "has done nothing for the security industry," that its "tests are irrelevant," and that UL "stands for useless and lacks credibility."
 
 
 12
 IV. Installations at Four Newark High Schools.
 
 
 13
 A Securitron dealer, Absolute Protective Systems, submitted a bid on September 3, 1987 to install electromagnetic locks at four high schools operated by the Newark Board of Education. Absolute's bid was $190,800, but it lost out to Kalon, which bid $153,300 to install Andralocks. It appears that Kalon's bid was less than cost and that only sixty percent of the work was completed when Kalon abandoned the job sites. Many of the Andra locks that were installed did not operate properly, fire department and UL approvals were lacking for them, and city and state permits had not been obtained. When Robert Salvatore, the Principal Engineer for the Newark Board of Education, withheld final payment to Kalon as the result of these deficiencies, Schnabolk threatened to have him removed from his position. Later, Schnabolk asked the Board of Education "to fire Salvatore outright." Kalon eventually received full payment.
 
 
 14
 After Kalon was awarded the contract for the four high schools, Schnabolk took steps to prevent future bids by Absolute in Newark. On September 10, 1987, he wrote a letter on Kalon stationery to the New Jersey Department of the Treasury. In the letter he referred to "the submission of a forged Pre-Qualification Statement by Absolute Protection Systems" and requested that "some penalty" be imposed upon that firm. Schnabolk later admitted that his purpose in making this false accusation "was to disqualify Absolute ... from ever bidding again in Newark."
 
 
 15
 V. Bidding on Nine Additional Newark High Schools.
 
 
 16
 After the installation of Andralocks by Kalon in the four high schools in 1988, the Newark Board of Education began to plan for the installation of electromagnetic locks at nine additional high schools. Anticipating the upcoming bids for this work, Osborne Frazier, Kalon's Vice President for Marketing, sent a letter on October 18, 1988 to Joseph Imperiale, Senior School Construction Inspector for the Newark Board of Education. Frazier wrote: "New York City has banned several other lock/magnets, and categorized them as illegal for installation on fire exits as they are prone to shorting-out, and are potentially hazardous. Securitrons [sic] lock/magnet happens to be one of that number."
 
 
 17
 Following this false statement regarding the Securitron lock, Schnabolk on November 3, 1988 wrote on Kalon stationery to James Kokkalis, Director of the Division of Design and Construction for the Newark Board of Education. In his letter, Schnabolk advanced similar false information: "The manufacturer that had his lock mounted on the doors of a Newark HS refuses all requests for replacement of defective units ... even though they sold the locks with a 5 year guarantee. This firm is Securitron and they have been rejected by the NYC Bureau of Standards and Appeals because of a basic design deficiency and they are prone to false alarms."
 
 
 18
 The Newark Board of Education issued the specifications for installation of electromagnetic locks at the nine additional high schools in or about March of 1989. The specifications were written and provided by another Schnabolk entity, the Institute for School Security, apparently in violation of a New Jersey rule prohibiting those who would bid from writing the specifications. Originally, the Securitron Magnalock was prohibited, but that prohibition was removed from the specifications before the bidding at the instance of Ahmed Khalifa, the Principal Engineer for the Board of Education. On March 7, 1989, four contractors submitted bids, with Kalon offering the Andralock and the three others offering the Securitron Magnalock. Kalon was the highest bidder. The two low bidders were Professional Security Corp. on eight schools and Absolute on one school.
 
 
 19
 Less than one week after the bids were opened, Frazier sent a letter on Andra stationery to Kokkalis, who was Khalifa's supervisor. Attacking the Securitron lock, Frazier wrote that a Securitron contractor "was eliminated [last year] and threatened with a default" by the New York City Health and Hospitals Corporation and that "it is now illegal to use the Securitron lock on any fire exit door in NYC." Frazier also suggested that the Securitron lock is "not technically capable of producing a fail safe system" and therefore "should be eliminated from the bidding process." In a letter dated April 4, 1989, Schnabolk wrote to Kokkalis on Kalon stationery, substantially reiterating the false information supplied by Frazier. On June 21, 1989, Frazier wrote to Kokkalis on Andra stationery, falsely asserting that Absolute had "submitted a fraudulent (forged) 'Notice of Classification' last year on similar work." Following this assertion, he stated: "We had assumed that such action would preclude any future awards by your School Board."
 
 
 20
 VI. Threats to Khalifa.
 
 
 21
 Soon after Khalifa recommended to the Newark Board of Education in May of 1989 that contracts be awarded to Professional Security Corp. and Absolute, Schnabolk called Khalifa and threatened to "destroy" him through high-level contacts at the Board. Schnabolk reiterated the false statements that the Securitron locks were prohibited from being used in New York and that they shorted out in a locked position. On May 18 Khalifa called Schnabolk as directed by his superior, Kokkalis, to follow up on a letter Schnabolk had sent to Kokkalis. In that conversation, Schnabolk again threatened to "destroy" Khalifa and said that he would have him removed from his job if Kalon did not receive the contract for the nine high schools.
 
 
 22
 In August of 1989, Schnabolk wrote to Kokkalis that "[i]t would be in the best interests of the Newark Board of Education if Khalifa were removed from his highly sensitive job as soon as possible." Apparently, Schnabolk made numerous attempts to accomplish this goal. Khalifa testified that "great pressure" was brought to bear upon him by his superiors to award the contract to Kalon, the high bidder. Ultimately, neither the Securitron dealers nor Kalon were awarded the contract, and Khalifa was removed from his position with the Newark Board of Education.
 
 
 23
 VII. Replacement at Barringer High School.
 
 
 24
 By falsely representing that the Securitron Magnalocks installed at the Barringer High School in Newark were defective, Schnabolk was able to replace them with Andralocks. Prior to 1985, Kalon had used Magnalocks in its business, and during that time it had installed them in the Barringer High School. In February of 1988, however, Schnabolk convinced Layton Swinney, the Director of Security at the Newark Schools, to award the Institute for Security Design a maintenance contract to repair the electromagnetic locks that had been installed at the Barringer High School. Schnabolk used that contract to sell Andralocks in circumvention of the New Jersey Bidding Law that requires bidding for any contract worth $10,000 or more. Instead of repairing the Magnalocks, Schnabolk replaced them with Andralocks.
 
 
 25
 To justify the replacements, Andra provided Swinney with three Magnalocks, claiming that they had shorted into a locked position. In fact, the locks were fully operable. Not only were properly functioning Magnalocks removed from Barringer High School, but the Andralocks that were used to replace them did not work. Moreover, contrary to an assertion made by Schnabolk that Magnalocks had been returned to Securitron for replacement, no defective locks had ever been returned to Securitron.
 
 
 26
 VIII. Communications with the Health and Hospitals Corporation.
 
 
 27
 The Neponset Health Care Center, a facility of the New York City Health and Hospitals Corporation ("HHC") sought bids for electromagnetic lock installations. There were at least three bidders, including Kalon, and the bids were opened on May 11, 1988. The contracts were awarded to the low bidder, a Securitron dealer. On August 18, 1988, at Schnabolk's request, members of the HHC staff met with Schnabolk and Frazier to discuss the bids. Schnabolk said that he wanted the low bidder to be "thrown out" and "banned from ever doing a job for" HHC. He repeated the falsehood that the Securitron Magnalock did not have BSA approval and that "the lock shorts out." On the day following the meeting, Schnabolk wrote to the HHC on Kalon stationery, again noting the lack of "fail-safe integrity" of the Securitron lock and asking that the Securitron dealer be eliminated from the bidding.
 
 
 28
 On October 24, 1988, by letter written to HHC, Schnabolk once again sought the disqualification of the Securitron dealer from bidding on HHC contracts. In that letter, addressed to Mr. Kenneth McNutt, a Vice President of HHC, Schnabolk wrote: "I am initiating action to sue you and other members of your strange organization, and if you don't answer me, you will have to eventually answer to the D.A. or the Mayor's Committee on Corruption." Ultimately, the award to the Securitron dealer was cancelled and the contract was not awarded to any of the bidders.
 
 
 29
 IX. Communications with the American Society of Industrial Security.
 
 
 30
 The American Society of Industrial Security ("ASIS") is an organization of security professionals who are potential customers for electromagnetic locks. Security Management is the official magazine of ASIS, and its January 1989 issue included an article describing the use of the Securitron Magnalock as part of the security system at the Santa Barbara Museum of Art. Responding to the article in a letter to the magazine's editor dated January 20, 1989 on the stationery of the Institute for Security Design, Schnabolk represented himself as a "consultant and a long time user" of electromagnetic locking systems. In the letter, Schnabolk falsely represented that the Magnalock posed a danger to the occupants of any building where the locks were used and that "the New York City Fire Department has ... found them unacceptable and removed [them] from the list of approved locks a few months ago." Schnabolk also falsely represented that "[t]he Newark Board of Education regularly issues contracts to have them removed from the schools that had them installed before they realized what they were getting."
 
 
 31
 In his September 1989 lecture at the ASIS Conference at Nashville, Tennessee, Schnabolk put on a slide show that included a slide explaining why the Magnalock should not be used. In the slide, a line was drawn through the Securitron name and there was the following false statement: "Securitron loses [BSA] approval due to defective design in 1988." Copies of the slide were widely distributed at various trade shows to architects and potential lock customers.
 
 
 32
 X. Letter to Securitron Sales Representatives.
 
 
 33
 Falsely representing himself as "a purchaser of the Securitron lock for the last five years," Schnabolk sent to three of Securitron's major sales representatives a copy of a letter dated June 27, 1989 that he had written to the Chairman of the Board of Securitron. The sales representatives are independent commission salesmen who sell Securitron products to distributors, dealers and end users. In this letter, Schnabolk wrote that he had information that Securitron's Vice President for Marketing had "lied to the New York City Building Department by claiming that the lock was approved by UL ... and as a result, the lock is now outlawed in NY." The letter referred to the increase in "returns of defective units" and included a statement that "[t]he lock has always been difficult to mount and electric shorts due to poor wire insulation has [sic] always been a problem." Securitron introduced evidence demonstrating the falsity of each of the quoted statements. In discussing the declining quality of the Securitron lock, Schnabolk wrote that he "recognize[d] the symptoms of a company that is going out of business."
 
 
 34
 XI. The Telephone Call to General Motors.
 
 
 35
 Using the name "Greg Saunders," Schnabolk placed a telephone call on July 18, 1989 to Danny Whiteman, a senior General Motors security manager. The call was made to Whiteman's office in Warren, Michigan, and Schnabolk left the Kalon telephone number as a call back number with Whiteman's secretary. General Motors had been a Securitron customer for some years, and Whiteman was involved in the design of electronic security systems for his employer. When Whiteman called back, Schnabolk identified himself as an independent security consultant and inquired whether General Motors had experienced any difficulties with the Securitron Magnalock. He received a negative response to his question. Schnabolk repeated to Whiteman the same misrepresentations that he had made to others on numerous occasions: that the Securitron lock had short circuit problems and that it was "barred" in New York.
 
 
 36
 XII. The Verdict and the Judgment.
 
 
 37
 In response to specific questions regarding Securitron's RICO claim, the jury found: that the defendants Schnabolk, Kalon and Andra constituted an "enterprise;" that the defendants engaged in two or more acts of "racketeering;" that the racketeering acts were connected by a common scheme, plan or motive; that the acts were committed within ten years of each other and constituted a pattern of racketeering; and that Securitron suffered an injury in its business as the result of the pattern. On this claim, the jury assessed damages as follows: $150,000 for lost profits; $100,000 for out-of-pocket expenses and $100,000 for injury to reputation and/or loss of goodwill.
 
 
 38
 With respect to Securitron's defamation claim, the jury specifically found that defendants made false written or oral statements that disparaged Securitron's business methods and integrity; that the statements were communicated to a third party; and that the statements were made with malice. Damages duplicative of those found on the RICO claim were assessed.
 
 
 39
 As to the claim pleaded under New York General Business Law Sec. 349, the jury found that the defendants engaged in materially deceptive acts and practices within the State of New York; that the primary injury resulting from the acts and practices was suffered by the public; and that Securitron was injured by the deceptive acts and practices. Out-of-pocket expenses of $100,000 and damages for loss of reputation of $100,000, both duplicative of the damages award for those items in the RICO claim were awarded.
 
 
 40
 The district court signed and entered an Order and Judgment in which it trebled the RICO damages to $1,050,000, awarded attorney's fees under the RICO statute and the New York General Business Law in the amount of $284,134, costs in the sum of $58,847 under the RICO Act, and permanently enjoined the defendants from engaging in materially deceptive acts and practices in the State of New York. Specifically, the defendants were enjoined from making the following false statements: that locks manufactured by Securitron short in a locked position; that Securitron locks are barred in New York City; that the Newark Board of Education regularly issues contracts for the removal of Securitron locks from Newark Schools; and that Securitron locks failed a test administered by the UL.
 
 DISCUSSION
 A. The RICO Claim
 
 41
 Appellants' principal challenge to the judgment entered against them on the RICO claim rests on their contention that Securitron failed to establish the existence of a RICO enterprise. According to Securitron, Schnabolk and the two corporations through which he operated, Kalon and Andra, were persons participating in the conduct of the affairs of an "association in fact" enterprise through a pattern of racketeering activity. The jury found that Schnabolk, Kalon and Andra constituted the enterprise.
 
 
 42
 The judgment on the RICO claim rests upon the provisions of 18 U.S.C. Sec. 1962(c), which provides:
 
 
 43
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.
 
 
 44
 "Enterprise" is defined as
 
 
 45
 any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
 
 
 46
 18 U.S.C. Sec. 1961(4).
 
 
 47
 Relying on Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339 (2d Cir.1994), appellants contend that the requirement that the enterprise be distinct from the persons who participate in the enterprise has not been met. In Riverwoods, the plaintiffs alleged that Marine Midland Bank was a person conducting the affairs of its own Restructuring Group, a unit of the Bank involved in restructuring loans, through a pattern of racketeering activity. We determined that the Restructuring Group was not distinct from the Bank itself and that the activities of the Group were nothing more than the activities of Bank employees carrying out the business of the bank. Where employees associate with their corporate employer solely for the purpose of carrying on the regular affairs of the employer, it cannot be said that the corporation is a separate enterprise:
 
 
 48
 Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself.... Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.
 
 
 49
 Id. at 344. Accordingly, we held that Marine Midland could not be both the RICO person and the RICO enterprise under section 1962(c). Id. at 344-45; see also Bennett v. U.S. Trust Co., 770 F.2d 308, 315 (2d Cir.1985), cert. denied, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).
 
 
 50
 While it is true that "a corporation cannot be both the enterprise and the person," Official Publications, Inc. v. Kable News Co., 884 F.2d 664, 668 (2d Cir.1989), the situation is different here. Kalon and Andra were two separate and distinct corporations. While Schnabolk was an officer or agent of each corporation, each was an independent entity that could benefit from his nefarious activities. We have held that "a corporate entity [may be] held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself." Riverwoods, 30 F.3d at 344. Here, Kalon is an entity distinct from Andra, and both corporations are distinct from Schnabolk.
 
 
 51
 Kalon has at various relevant times employed six to 15 people. The two corporations are in distinct lines of business: Andra manufactures electromagnetic locks and other components of alarm systems; Kalon markets security systems to governmental, institutional and commercial customers and in 1990 was one of the biggest installers of electromagnetic locks on fire doors in its New York market. In short, these corporations were active, operating businesses rather than two stacks of stationery. Despite Schnabolk's links to each corporation, he, along with the two corporations, clearly is a RICO person as well as a member of a RICO enterprise. See Jacobson v. Cooper, 882 F.2d 717, 720 (2d Cir.1989). Moreover, the defendants together constitute an enterprise that, while consisting of no more than those three RICO persons, is distinct from each of them. See Cullen v. Margiotta, 811 F.2d 698, 728-30 (2d Cir.), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); Fleischhauer v. Feltner, 879 F.2d 1290, 1297 (6th Cir.1989), cert. denied, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 611 (1990).
 
 
 52
 Appellants argue that "Charles Schnabolk and his two one-man corporations" do not constitute an enterprise. However, even if Schnabolk owned 100% of the shares of each corporation, the corporations would be separately existing legal entities capable of constituting an association-in-fact enterprise. See Fleischhauer, 879 F.2d at 1297. Both corporations benefited from the illicit activities of their agents, Schnabolk and Osborne, whose fraudulent practices and defamatory statements were designed to enhance their business interests. Schnabolk also acted to accomplish the same purposes individually and through the Institute for Security Design.
 
 
 53
 One objective of the unlawful conduct was to create multiple sources for rumors concerning the supposed dangers of Securitron locks. The participation of Andra and Kalon in that scheme was efficacious partly because each of them was an actual ongoing business with a presence in the marketplace. Thus, in the scheme to obtain customers for electromagnetic lock installations for New York high schools in 1989, the two corporations made coordinated attacks on the Securitron locks.[1] The use of particular stationery at particular times was not random; the jury could conclude that there was a deliberate effort to use both independent entities to give a spurious validity to the rumors. The jury had adequate evidence to support their finding identifying Schnabolk, Kalon and Andra as an association-in-fact and as the persons who conducted the enterprise as well.
 
 
 54
 We have considered appellants' other contentions regarding the RICO claim and have found them to be meritless.
 
 B. The New York General Business Law Claim
 
 55
 Appellants contend that Securitron has no standing to assert a claim under New York General Business Law Sec. 349 because Securitron has not demonstrated any harm to the public and is simply a business competitor of the appellants. We reject this contention.
 
 
 56
 New York General Business Law Sec. 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." Although the statute is, at its core, a consumer protection device, see Genesco Entertainment v. Koch, 593 F.Supp. 743, 751 (S.D.N.Y.1984), "corporate competitors now have standing to bring a claim under this [statute] ... so long as some harm to the public at large is at issue," Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 786 F.Supp. 182, 215 (E.D.N.Y.), vacated in part on other grounds, 973 F.2d 1033 (2d Cir.1992); see also Construction Technology, Inc. v. Lockformer Co., 704 F.Supp. 1212, 1222 (S.D.N.Y.1989). Section 349 does not expressly provide a right of action by one business competitor against another, but it does provide a "right of action to 'any person who has been injured by reason of any violation of this section.' " H2O Swimwear, Ltd. v. Lomas, 164 A.D.2d 804, 560 N.Y.S.2d 19, 21 (1st Dep't 1990) (quoting Sec. 349(h)). It is clear that "the gravamen of the complaint must be consumer injury or harm to the public interest." Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988). The critical question, then, is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor.
 
 
 57
 Although appellants argue that "there is absolutely nothing in this record showing that this private commercial dispute between the plaintiff and the defendant was aimed at the public," they concede that "the public might have been incidentally affected by this private commercial dispute." We think that the harm to the public was manifest. The evidence demonstrated that appellants gave false information about the Securitron Magnalock to the BSA, a regulatory agency primarily concerned with the safety of the public. Schnabolk caused the BSA to undertake unnecessary investigations and interfered with its decisionmaking process by complaining of non-existent "potential danger ... in fire safety situations." His activities in this respect surely were contrary to the public interest.
 
 
 58
 Also, appellants disseminated false information to HHC in regard to electromagnetic lock installations at the Neponset Health Care Center and may have caused the unnecessary cancellation of an awarded contract. Finally, it was detrimental to the public interest to divert the attention of UL from its normal activities to attend to the false accusations and deceptions of the appellants. The UL stamp of approval is frequently required to assure the safety of electrical equipment and installations in New York.
 
 
 59
 We reject appellants' contention that the injunctive relief granted by the district court on the General Business Law claim is unwarranted and contrary to the free speech provisions of the New York State Constitution.
 
 
 60
 C. The Defamation Claim and Damages Generally
 
 
 61
 In challenging the judgment on the defamation claim, appellants assert that "plaintiff did not prove a single item of damage from the alleged defamation, except for Mr. Cook's statement that there must have been someone out there who did not deal with the plaintiff because of the defendants' statements." Mr. Cook is Robert Cook, President of Securitron. Citing Wachs v. Winter, 569 F.Supp. 1438, 1443 (E.D.N.Y.1983), as well as N.Y.Jur.2d Defamation and Privacy Sec. 212, appellants contend that defamation damages are limited to actual or compensatory damages commensurate with the harm suffered and that "[t]here was no showing that any specific statement caused any harm at all."
 
 
 62
 Contrary to appellants' contention, Robert Cook gave extensive testimony regarding the damages sustained by his company. The evidence demonstrated that specific customers, such as the Newark Board of Education and HHC, had stopped dealing with Securitron. Cook testified to a "flattening out" of otherwise increasing yearly sales, which he estimated to reflect the loss of $500,000 in sales and $200,000 in lost profits. Cook was entitled to prove damages through a "projection of lost profits based on evidence of record regarding decreased sales." See Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 404 (3rd Cir.1980). Cook's projections provided the jury with a reasonable basis upon which to calculate lost profit damages. See Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir.1992). Securitron's president was fully capable of examining the company's sales over a period of years, noting a slow-down, and testifying to the estimated losses attributable to the defamatory and fraudulent activities of appellants.
 
 
 63
 Fed.R.Evid. 701 permits a lay witness to testify to an opinion "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Accordingly, a president of a company, such as Cook, has "personal knowledge of his business ... sufficient to make ... [him] eligible under Rule 701 to testify as to how lost profits could be calculated." In re Merritt Logan, Inc., 901 F.2d 349, 360 (3rd Cir.1990). A company president certainly is capable of projecting lost profits where the projection is based on evidence of decreased sales. See Teen-Ed, 620 F.2d at 403-04. It is noteworthy that appellants cross-examined Cook extensively and that the jury did not award the total loss of profits testified to by Cook. The same lost profits were found with respect to the RICO claim.
 
 
 64
 Duplicative out-of-pocket loss damages were awarded on the RICO, General Business Law and defamation claims. Such damages properly were awarded on the basis of specific travel expense reimbursement statements received in evidence along with the testimony of Cook. The award of duplicative damages for loss of good will also was supported by the evidence.
 
 CONCLUSION
 
 65
 We have carefully examined the remaining arguments for reversal advanced by appellants and find them unpersuasive. We affirm the judgment of the district court in all respects.
 
 
 
 [1]
 Osborne Frazier, Kalon's managing vice president, sent a letter on October 18, 1988 to a construction inspector for the New York Board of Education; on March 13, 1989, Frazier sent a letter on Andra stationery to James Kokkalis, who was administering the bidding process for the New York school system, also falsely attacking the Securitron locks; on April 4, 1989, Schnabolk wrote to Kokkalis on Kalon stationery repeating some of the earlier falsehoods; on June 21, 1989, Frazier wrote to Kokkalis on Andra stationery promoting much the same agenda. It would be error to characterize Frazier as nothing more than Schnabolk's amanuensis. He had been Director of Security Services for Newark's Board of Education. Correspondence from him could be expected to carry the weight of his personal experience and reputation