IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-60723
_____

MISSISSIPPI CHEMICAL CORPORATION,

Plaintiff - Appellee-Cross-Appellant,

versus

DRESSER-RAND COMPANY,

Defendant - Appellant-Cross-Appellee.

Appeals from the United States District Court
for the Southern District of Mississippi

_____

March 29, 2002

Before JOLLY and PARKER, Circuit Judges, and Mills[*], District Judge

E. GRADY JOLLY, Circuit Judge:

This appeal presents issues under Mississippi law concerning the statute of limitations for breach of warranty claims, contractual warranties, and the assessment of damages resulting from the failure of machinery.

In 1989, Dresser-Rand Company ("Dresser") designed and sold Mississippi Chemical Corporation ("MCC") a gas compressor train for use in the production of ammonia. The compressor train consisted

_____

[*]District Judge of the Central District of Illinois, sitting by designation.

1

of, _inter alia_, two separate compressors -- a high case compressor and a low case compressor.[1]  The compressor train did not work as promised.  The high case compressor broke in 1990.   The low case compressor broke in 1993 and again in 1996.  Each time one of the compressors malfunctioned, Dresser attempted to repair the compressor train.

MCC eventually filed suit, claiming negligent design, breach of express warranty, and breach of the implied warranties of merchantability and fitness for a particular purpose.  A jury awarded MCC damages on the warranty claims in the amount of $4,422,876.92.   Dresser appeals the judgment, arguing issues relating to the statute of limitations, to the terms of the warranty, to the proper notice of breach of the warranty, and to damages.[2]

We hold first that the statute of limitations does not preclude MCC's express warranty claim because the failure of the repair or replace remedy for the warranty occurred within six years of the date that the complaint was filed.  Second, we hold that the express terms of the warranty do not bar MCC's cause of action. Third, we hold that MCC provided adequate notice of the defects in the compressor train to trigger liability under the express

---

[1]The "high" and "low" refer to the pressure in each individual compressor.

[2]In the event of a reversal or remand, MCC cross appeals alleging three errors on the part of the district court.  Because we are affirming the district court's judgment, we do not address MCC's cross appeal claims.

warranty.  Finally, we hold that the damage award calculation made by the jury was not (1) as a substantive matter, incorrect or (2) under the evidence presented, speculative. Accordingly, we affirm the judgment of the district court.

I

MCC produces ammonia at its fertilizer plant in Yazoo City, Mississippi.  For the most part, the ammonia is used as an input in fertilizer -- a small amount is sold on the market or stored in inventory for future use.  The production of ammonia involves the compression of gas in a compressor train.  Each train consists of, among other things, a low case and a high case compressor.

In 1989, in an effort to increase its ammonia production, MCC bought a specially designed compressor train from Dresser.  The sales contract for the train contained an express warranty guaranteeing that the train would be free from defects and comport with certain technical specifications.  As an exclusive remedy for the breach of this warranty, Dresser offered to correct promptly any defect at its own expense.

In April 1990, the high case compressor broke.  MCC notified Dresser of the problem and shipped the high case compressor to New Orleans for repair.  Dresser supplied a redesigned compressor and assured MCC that this new compressor would cure all the defects in the train.

In December 1992, however, MCC began to experience excessive vibrations in the low case compressor.  In May 1993, these vibrations became sufficiently severe to require a reduction in the

speed of the compressor train.  This reduction resulted in a loss of ammonia production.

In September 1993, Dresser identified a fracture in a component (the 7th stage impeller) of the low case compressor as the cause of the vibration problem and recommended a modification of that component.  In December 1993 and again in November-December 1996, similar vibration problems were identified in the other components of the low case compressor (specifically, the 4th, 5th, and 6th stage impellers).  Dresser agreed to inspect and modify these components.

In December 1996, Dresser advised MCC that similar repairs would have to be made to the impeller components of the high case compressor.

In March 1997, MCC filed suit for breach of the express warranty, breach of the implied warranties of merchantability and fitness for a particular purpose, and negligent design.

Dresser filed a motion to dismiss, asserting that Mississippi Chemical's warranty claims were barred by the statute of limitations.  In denying the motion, the district court found that Dresser's statute of limitations defense contained mixed questions of law and fact and, therefore, was not amenable to summary disposition.

After discovery, Dresser filed a motion for summary judgment asserting again that the statute of limitations barred the warranty claims and, for the first time, asserted that the "economic loss"

4

doctrine barred MCC's negligent-design claim.[3]  The district court denied this motion.

The case proceeded to trial.  At the end of MCC's case-in-chief, Dresser renewed its motion for judgment as a matter of law based on the same reasons given in its summary judgment motion. The district court granted the motion in part, holding that the "economic loss" doctrine barred MCC's negligent design claim.  On the remaining warranty claims, however, the case went to the jury.

The jury found that Dresser had breached (1) the implied warranty of merchantability; (2) the implied warranty of fitness for a particular purpose; and (3) the express warranty.  The jury based its breach of the express warranty finding on a conclusion that the exclusive "repair and replacement" remedy had failed its essential purpose.  The jury awarded MCC $4,422,876.92 in damages for the profits lost during the three different periods when the compressor train was malfunctioning.

The district court then denied Dresser's post-verdict motions for (1) judgment as a matter of law and (2) remittitur or a new trial.  Dresser now appeals the denial of these motions.[4]

---

[3]The "economic loss" doctrine provides that a "plaintiff who suffers only economic loss as the result of a defective product may have no recovery in strict liability or negligence, though such damages may be pursued under a breach of warranty theory of liability."  East Mississippi Elec. Power Ass'n v. Porcelain Products Co., 729 F.Supp. 512, 514 (S.D.Miss. 1990).  A Mississippi appellate court has applied this doctrine.  State Farm Mut. Auto. Ins. Co. v. Ford Motor Co., 736 So.2d 384, 386 (Miss.App. 1999).

[4]Dresser also appeals the judgment entered on the jury verdict. This judgment appeal duplicates the appeal of the district court's denial of the motion for judgment as a matter of law.  Accordingly,

5

We review de novo the district court's ruling on a motion for judgment as a matter of law. See Cozzo v. Tangipahoa Parish Council-President Government, 279 F.3d 273, 280 (5th Cir. 2002) (citation omitted). However, when an action is tried by a jury, such a motion is a challenge to the legal sufficiency of the evidence supporting the jury's verdict. Brown v. Bryan County, Okla., 219 F.3d 450, 456 (5th Cir. 2000), cert. denied, 532 U.S. 1007 (2001). Accordingly, we consider the evidence "drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party[.]" Id. Furthermore, we must always keep in mind "that our standard of review with respect to a jury verdict is especially deferential." Id. Thus, we will reverse "only if no reasonable jury could have arrived at the verdict." Snyder v. Trepagnier, 142 F.3d 791, 795 (5th Cir. 1998) (citation omitted), cert. dismissed, 526 U.S. 1083 (1999).

We review the denial of a motion for new trial for abuse of discretion. See Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1049 (5th Cir. 1998) ("Absent a clear showing of an abuse of discretion, we will not reverse the trial court's decision to deny a new trial.") (citations and internal quotation marks omitted).

II

---

we treat Dresser as appealing only the denial of its motion for judgment as a matter of law and the denial of its motion for a new trial or remittitur.

6

We first address Dresser's arguments with respect to liability.

A

(1)

Dresser argues that it is not liable for the breach of the express or implied warranties because the statute of limitations bars any warranty-based cause of action.

The Mississippi version of the UCC sets out the statute of limitations for contract claims:

> (1)   An action for breach of any contract for sale must be commenced within six (6) years after the cause of action has accrued.
>
> (2)   A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when the tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

MISS. CODE ANN. § 75-2-725(1)-(2).  Dresser argues that the second sentence of Section 75-2-725(2) bars any cause of action based on breach of warranty -- implied or express.  Dresser correctly states that in breach of warranty cases, the Code defines, as the starting date for the statute of limitations, the date of delivery in all but one situation (i.e., where there has been a guarantee of future performance).

Applying this definition to the facts at hand, Dresser states that it is undisputed that it delivered the compressor train to MCC in 1989, more than six years before MCC filed its complaint.

7

Consequently, Dresser concludes that all of MCC's warranty claims are barred as a matter of law.  With respect to MCC's express warranty claim, this argument is unpersuasive.

The express warranty for the compressor train reads in relevant part:

> Seller warrants to Purchaser that the Equipment supplied hereunder by Seller will be free from defects in material and workmanship, will be of the kind and quality designated and described in this Offer and will conform with all applicable specifications and drawings incorporated herein.  If, within eighteen (18) months from the date of delivery of the Equipment to Purchaser, or (12) months from the date of start-up, whichever occurs first, Seller receives from Purchaser written notice that the Equipment supplied hereunder does not meet the warranties specified above, and if the Equipment does not meet such warranties, Seller shall promptly correct each such defect at its own expense.
>
> Purchaser's exclusive remedies for breaches of the express warranties contained in this Contract shall be stated herein.

This express warranty is a "repair or replacement" warranty. To "repair or replace" represents the exclusive remedy for a breach of the express warranty.  Under the Mississippi UCC, "backing up" an express warranty with an exclusive promise to repair or replace the good in question is permissible.  MISS. CODE ANN. § 75-2-719(1)(a).  But if the repair or replacement remedy fails its essential purpose, then the buyer may seek any alternative remedy provided in the Code.  MISS. CODE ANN. § 75-2-719(2).  Under Section 719, the buyer <u>first</u> must seek repair or replacement to remedy a breach of an express warranty, and only if the seller fails to meet this promise (in UCC speak, the repair or replacement remedy fails its essential purpose), may the buyer bring a contract action.

8

It is important to distinguish Dresser's "repair or replace" promise from its promise that the compressor train would be free from defects.  See Delhomme Indus., Inc. v. Houston Beechcraft, Inc., 735 F.2d 177, 183 (5th Cir. 1984)(distinguishing a warranty and the limited remedy to enforce that warranty).  Based on this distinction, we read Sections 719 and 725 in tandem.  Accordingly, we hold that the cause of action based on the express warranty did not accrue for the purpose of Section 725, until the promise to repair or replace the compressor train failed its essential purpose.  The high case compressor failed in 1990.  Dresser immediately repaired and replaced this part of the compressor train.  The train then functioned normally until December 1992, when the low case compressor began to malfunction.  The malfunction caused the train to run at a diminished rate and produce less ammonia.  Thus, as a matter of law, December 1992 represents the earliest possible date that the repair and replace remedy could have failed its essential purpose.  Up until that point in time, the remedy was accomplishing its goal -- i.e., the 1990 repairs were successful and the compressor train was running smoothly.  Because MCC filed its complaint within six years of December 1992 -- the earliest possible date that Dresser could have breached the

limited remedy for the express warranty[5] -- the statute of limitations does not bar MCC's express warranty cause of action.[6]

(2)

Along slightly different lines, Dresser argues that the express terms of the warranty limit the duration of the warranty to eighteen months from the date of purchase or twelve months from the date of start-up. The malfunctioning periods for which the jury assessed damages began in 1993, more than twelve months after the date of the start-up (sometime shortly after October 3, 1989). So, according to Dresser, the compressor train was not covered by the express warranty during the malfunctioning periods at issue. We find this argument is unpersuasive.

As noted above, the relevant provision of the express warranty reads:

> If, within eighteen (18) months from the date of delivery of the Equipment to Purchaser, or (12) months from the date of start-up, whichever occurs first, Seller receives from Purchaser written notice that the Equipment supplied hereunder does not meet the warranties specified above, and if the Equipment does not meet such warranties, Seller shall promptly correct such defect at its own expense.

---

[5]In fact, because repair and replacement was the exclusive remedy for the breach of the express warranty, Mississippi law precluded MCC from bringing any contract action until after this date.

[6]It makes no difference that this cause of action was labeled as a breach of the express warranty as opposed to a breach of the repair or replace remedy. Once the repair and replace remedy was broken, Section 719 entitled MCC to proceed under any damage theory contained in the Mississippi Code, including a "breach of warranty" theory. See Delhomme, 735 F.2d at 184 ("when a limited remedy fails of its essential purpose, the buyer is relegated to the UCC remedy applicable to his underlying claim for redress")(citation omitted).

By its very terms, the eighteen and twelve months time limitations refer to the notice of the breach, not to the duration of the warranty. The contract required MCC to provide notice within twelve months of start-up, but if timely notice was given, the contract did not impose any time bar on Dresser's promise to repair. The contractual terms, therefore, do not preclude a breach of the express warranty claim stemming from the failure of the low case compressor in 1993 and 1996, if we assume that MCC provided adequate notice.[7] We now turn to address whether MCC's furnished notice sufficient to trigger Dresser's liability under the express warranty.

B

There are two notice requirements at issue -- the specific notice provision contained in the warranty and the default notice provision of the Mississippi UCC. Dresser's arguments and our

---

[7]Dresser also argues that the statute of limitations bars MCC's implied warranty claims. As made clear from our earlier discussion, the jury awarded MCC consequential damages based on the lost profits caused by the malfunctioning compressor train. In making this determination, the jury found breaches of the implied warranties of merchantability and fitness for a particular purpose as well as a breach of the express warranty. Here, the implied warranties and the express warranty are co-extensive -- that is, they provide the same guarantees relating to compressor train. Given this fact, the consequential damages resulting from a breach of both the implied and express warranties are -- as undisputed by the parties -- the same as the consequential damages resulting from a breach of the express warranty only. In other words, once liability attaches under the express warranty, there are no additional consequential damages incurred because of a breach of the implied warranties. Because we have held that MCC can maintain an action for a breach of the express warranty, we see no reason to decide whether the statute of limitations bars MCC's implied warranty claims.

11

analysis are, however, the same with respect to both requirements. We outline the two relevant notice requirements before considering Dresser's arguments.

As previously noted, the express warranty reads:

[I]f, within eighteen (18) months from the date of delivery of the Equipment to Purchaser, or twelve (12) months from the date of start-up, whichever occurs first, Seller receives from Purchaser written notice that the Equipment supplied hereunder does not meet the warranties specified above, and if the Equipment does not meet such warranties, Seller shall promptly correct each such defect at its own expense.

The other notice provision at issue -- the default notice provision of the Mississippi UCC -- requires that a buyer who accepts tender of goods "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." MISS. CODE ANN. § 75-2-607(3)(a). For notice to be sufficient under 607(3)(a), "[it] need not be a specific claim for damages or an assertion of legal rights." Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 976 (5th Cir. 1976)(citations omitted).

The sale of the compressor train occurred in March 1989. In April 1990, MCC wrote to Dresser, stating "[t]his letter constitutes notice by MCC that [Dresser] is in breach of the warranties provided in said Contract." Dresser argues that this notice letter relates only to the damaged high case compressor. Dresser asserts that it did not receive -- as mandated by the warranty's terms -- timely notice of the defects in the low case compressor, that is, within twelve months of the date of the start-

12

up. Dresser contends that the plain terms of the warranty, therefore, exclude claims based on the failure of the low case compressor. Along similar lines, Dresser argues that because it never received written notice of the defects in the low case compressor, MCC did not comply with the default notice requirement of the Mississippi UCC and, therefore, MCC's express warranty claim is barred as a matter of law. The express warranty here required notice of defects in the "Equipment" to trigger liability under the express warranty. The contract, in turn, defined "Equipment" to include both the high case and the low case compressors.

It is undisputed that MCC gave notice of defects in the high case compressor within the time frame contemplated by the warranty. It is further undisputed that MCC provided evidence that the defects in the high case compressor were common to the low case compressor as well. Given this evidence, a reasonable jury could have concluded -- under the express notice provision of the contract and/or the default notice provision of the Mississippi UCC -- that MCC's 1990 letter provided sufficient notice to trigger liability for any common defect in the low case or the high case compressor. See Eastern Air Lines, 532 F.2d at 973 (citations omitted)(holding that whether a notice provision has been complied with "is a question which is particularly within the province of the jury").[8]

_____

[8]There are two plausible readings of the notice provision in the contract. Under one reading, the notice provision addresses any equipment that is subject of the contract -- that is, a single

13

The district court therefore did not err in denying Dresser's motion for judgment as a matter of law based on a lack of notice.

III

A

We now turn our attention to the issue of damages. In this appeal, Dresser challenges both the sufficiency of the evidence supporting the damage award and whether the jury's method of computation was flawed under Mississippi law.

As noted previously, our standard of review for sufficiency of the evidence is highly deferential to the jury's verdict. See Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969) (en banc) ("If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper."), overruled on other grounds, Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir. 1997) (en banc). In contrast, we review de novo the legal conclusions that the district court made concerning the damage award. See Nero v. Indus. Molding Corp., 167 F.3d 921, 929 (5th Cir. 1999)(holding that the court

---

notice of defect in the compressor train served to cover as notice for each and every defect that occurred in the train. An alternative reading of the contract suggests notice as to each defect before the warranty was triggered. Given that there are two plausible readings of the contractual provision at issue -- and one is consistent with the verdict -- we see no reason to set-aside the jury's determination that Dresser received adequate notice to trigger liability under the express warranty.

should review legal issues, such as the availability of a specific type of damages, de novo).[9]

At trial, MCC put on evidence of the damages resulting from the lost production of ammonia during the three different periods when the compressor train was malfunctioning. The periods were: (1) May 17, 1993 to September 17, 1993; (2) December 17, 1993 to August 31, 1994; and (3) November 25, 1996 to February 25, 1997. For the most part, during each of these three periods the compressor train continued to produce ammonia, albeit at a diminished rate.

MCC's damage calculation -- which was accepted in whole by the jury -- consisted of a three-step process: First, MCC computed the

---

[9]Several panels of this court recently have held, erroneously, that courts should review a jury's damage award for clear error. See Cozzo, 279 F.3d at 294 ("This court will reverse a jury's assessment of damages only for clear error.")(citation omitted); Pendarvis v. Ormet Corp., 135 F.3d 1036, 1038 (5th Cir. 1998)("A jury's assessment of damages, on the other hand, will only be reversed for clear error.")(citation omitted); Ham Marine, Inc. v. Dresser Indus., 72 F.3d 454, 462 (5th Cir. 1995)("The jury calculated that Ham suffered damages in the amount of $3,517,283.94 as a result of Dresser's breach of contract. An assessment of damages is not reversed unless it is clearly erroneous.")(citations omitted). The statements in these cases are contrary to the established precedent in this circuit. The rule is reflected in Farpella-Crosby v. Horizon Health Care, 97 F.3d 803 (5th Cir. 1996): "The determination . . . requires a detailed analysis of whether the specific facts and circumstances reflected by the evidence presented to the jury are sufficient to support the jury's findings and award. We are governed by the standard set out in Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc) [that is, no reasonable jury could have arrived at the verdict under the evidence presented]." Id. at 805 (emphasis added); See also Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 783 (5th Cir. 1983)("The jury's assessment of damages is even more weighted against appellate reconsideration [than a district court's assessment].").

profit per unit of ammonia during each of the three malfunctioning periods.[10]  Second, it estimated the quantity of ammonia lost in each malfunctioning period because of the reduction in the speed of the compressor train.  Finally, it multiplied the profit per unit by the number of units lost to come up with the total amount of damages (i.e., lost profits) caused by the malfunctioning compressor train.

Dresser lodges two objections to this damage calculation.  First, it suggests that because MCC dipped into other sources of ammonia (e.g., its existing inventory, its production from its Donaldsonville plant, and the open market[11]) to make up for the lost

---

[10]   MCC did this by first subtracting from the gross sales of ammonia (i.e., market price X quantity of ammonia) the cost of delivery and other discounts.  MCC then divided this figure by the total quantity of ammonia sold -- this yielded the so-called "net-back" price of the ammonia.  From this net-back price, MCC subtracted the per unit costs of electricity, natural gas, and the other variable inputs used in the production of ammonia.

Dresser contends that this lost profit calculation is incorrect because MCC used the market price to compute the profit per unit even though the majority of MCC's ammonia production was, in fact, used as inputs into other products (e.g., fertilizer). We do not find this argument persuasive.

The market price is a reasonably good proxy for the lost ammonia's value as an input.  To be sure, we can think of no better proxy.  After all, if the ammonia's value to MCC as an input was less than the market value, one assumes that MCC would have sold all of the ammonia it manufactured on the open market, which it did not.

Therefore, throughout the rest of our analysis of the damage issue, we ignore the fact that much of the ammonia production lost because of the malfunctioning compressor train was destined for use as an input.

[11]Throughout the remaining analysis, we refer to these three sources as simply MCC's "inventory."

production from the malfunctioning compressor train, its damages should be limited to the replacement cost of these substitute sources. Dresser refers to these substitute sources in UCC parlance as "cover," and contends that it is entitled to judgment as a matter of law because MCC offered no evidence concerning the value of this "cover."

Second, Dresser argues that the district court erred in admitting the testimony of Tim Sterling (the person whose testimony primarily supported MCC's damage calculation) because he had no personal knowledge of the facts underlying his testimony. Without Sterling's testimony, Dresser concludes, the jury could not have arrived at the same verdict.

We first address Dresser's argument on the substantive merits of the damage award and then proceed to its evidentiary argument. Throughout our analysis, we must keep in mind that the crux of Dresser's challenge is to the sufficiency of the evidence supporting the damage award.

(1)

"[T]he point of an award of damages, whether it is for breach of contract or for a tort, is, so far as possible, to put the victim where he would have been had the breach or tort not taken place." Chronister Oil Co. v. Unocal Refining and Marketing (Union Oil Co. of California), 34 F.3d 462, 464 (7th Cir. 1994)(Posner, C.J.)(citation omitted). This general principle serves as the

17

focal point of the appropriate measure of damages as we work our way through applicable provisions of the Mississippi UCC.

In the event of a breach of warranty, a buyer may seek direct, incidental, and consequential damages. MISS. CODE ANN. § 75-2-714. Here, the jury was only instructed on -- and presumably only awarded -- consequential damages. We therefore restrict our attention to consequential damages and do not consider any direct damages caused by the breach of the express warranty.

Under the Mississippi UCC, "consequential damages" include:

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) Injury to person or property proximately resulting from any breach of warranty.

MISS. CODE ANN. § 75-2-715(2). Under Mississippi law, lost profits are recoverable as consequential damages if three requirements are met: (1) the seller had reason to know at the time of contracting that if he breached the contract, the buyer would be deprived of those profits -- i.e., the lost profits were foreseeable; (2) the lost profits are reasonably ascertainable;[12] and (3) the lost profits could not have been reasonably prevented. See Massey-Ferguson, Inc. v. Evans, 406 So.2d 15, 19 (Miss. 1981).

(a)

---

[12]This requirement is easily satisfied in this case because the expected production rates used by MCC for each claim period were based on the average actual production of ammonia seven days before and after the compressor train malfunctioned.

18

The first requirement, foreseeability, requires that the breaching party, at the time of contracting, have reason to know that such "lost profits" were possible. See Id. (internal citation omitted). Foreseeability is to a large extent a notice requirement that requires buyers -- at the time of contracting -- to disclose the potential extent of their damages or forfeit the right to claim such damages upon breach. Such notice is critical because it ensures that the "contracted for" price reflects the entire scope of the risk (i.e., the potential liability for breach) that the seller has agreed to bear. See RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 141 (5th ed. Aspen 1998).

Whether damages are reasonably foreseeable is a finding of fact within the province of the jury. See Migerobe, Inc. v. Certina USA, Inc., 924 F.2d 1330, 1338 (5th Cir. 1991). Here, the jury heard evidence that (1) Dresser knew if the compressor train malfunctioned the ammonia plant would have to be shut-down; (2) Dresser knew that ammonia was necessary for the production of MCC products; and (3) in the past Dresser's predecessors in interest had made -- and serviced -- compressor trains for MCC. From this evidence, a reasonable jury could draw the conclusion that the lost profits from the lost production of ammonia were "reasonably foreseeable."[13]

---

[13]Dresser also argues that it could not have foreseen that the ammonia plant would ever produce more than 1400 tpd (tons of ammonia per day). Dresser bases this argument on the initial design contract in which MCC requested a compressor train that

19

We now turn to the "cover" requirement necessary for the recovery of "lost profits."  As noted above, Dresser argues that MCC's damages should be limited to the value of the substitute ammonia it secured to replace the diminished production by the compressor train.  Under Section 715(2) consequential damages are restricted to those damages "which could not be prevented by cover or otherwise." MISS. CODE ANN. § 75-2-715.  This "cover" requirement imposes on the buyer a duty to mitigate his damages.  Comment 2 UCC § 2-715.  When dealing with lost profits, this duty means that a buyer "cannot recover for losses he reasonably could have prevented."  See Massey-Ferguson, 406 So.2d at 19.

Dresser cites a number of cases for the proposition that because MCC covered by securing alternative ammonia, its damages

---

would allow the ammonia plant to produce up to 1400 tpd.

Dresser further contends that because MCC's damage calculation was based on expected production rates of 1402 tpd for the first claim period, 1531 tpd for the second claim period, and 1521 tpd for the third claim period, the jury could not have adopted -- as a matter of law -- MCC's damage calculation.

The jury heard evidence that the compressors in the compressor train were designed to run at 10,800 rpm (revolutions per minute). During the malfunctioning periods, the jury heard evidence that the compressors ran at a slower rpm.  The jury also heard evidence that when the train functioned normally, that is, the compressors functioned at the designed 10,800 rpm, the plant produced more than 1400 tpd.  Based on this evidence, a reasonable jury could have concluded that Dresser should have foreseen that malfunctioning compressors would run at lower rpm's, resulting in a reduction in ammonia production.  This is the only conclusion with respect to foreseeability that the jury had to reach to adopt MCC's damage calculation.

are limited to the cost of <u>that</u> cover. This argument does not reflect the law in Mississippi for the recovery of lost profits. To reiterate, the applicable law provides that the buyer can only recover for the lost profits he "could not have prevented by cover or otherwise." MISS. CODE ANN. § 75-2-715(2)(a). If the buyer chooses not to cover, (i.e., mitigate his damages) and cover would have prevented the lost profits, the buyer cannot recover for lost profits. See <u>H & W Indus., Inc. v. Occidental Chemical Corp.</u>, 911 F.2d 1118, 1123 n.9 (5th Cir. 1990)("Failure to cover does not deprive the buyer of all remedies but he may not recover consequential damages."); <u>Dura-Wood Treating Co. v. Century Forest Indus., Inc.</u>, 675 F.2d 745, 755 (5th Cir.)("The so-called loss of potential profits could have reasonably been prevented by a different form of cover or otherwise. In the absence of such preventive measures, the district court's award of consequential damages . . . is not authorized[.]"), <u>cert. denied</u>, 459 U.S. 865 (1982). In short, this "duty to mitigate" restriction on the award of lost profits has nothing to do with the actual cost of the cover.

To recognize that "cover," as argued by Dresser, is not mitigation of lost profits in this case, one must understand that the substitute sources of ammonia -- that is, ammonia from inventory -- represented a profit opportunity for MCC. It makes no ultimate difference whether the jury measured the damages as it did

21

here (see supra page 16) or as Dresser argues the jury should have measured the damages -- i.e., by computing the value of the ammonia units procured from MCC's own inventory. The ammonia was completely fungible. Because MCC had to make up for the lost ammonia production by dipping into its own inventory, it had fewer total units of ammonia. The jury heard evidence about the fewer number of units. It also heard evidence concerning the value (in terms of profits) of each of these units. The jury multiplied these two terms together to come up with the amount of lost profits. This award places MCC in the same position as it would have been but for the breach of warranty -- that is, if MCC had not had to dip into its own inventory. As noted earlier, this is the precise point of a contract damage award. See Chronister Oil, 34 F.3d at 464.

Accordingly, the damage award was not -- under de novo review of the legal issues involved -- incorrect. Morever, insofar as Dresser challenges the sufficiency of the evidence supporting the award, a reasonable jury, drawing all inferences in favor of MCC, could have determined the amount of damages as awarded in this case. In sum, the award complied with the three requirements necessary to recover "lost profits" as consequential damages under Mississippi law. Accordingly, the district court did not err by denying Dresser's motions for remittitur, a new trial, or judgment as matter of law based on an alleged misguided damage calculation.

(2)

Finally, we address Dresser's evidentiary challenge. Dresser argues that the district court abused its discretion when it allowed testimony by Sterling, MCC director of risk management and property taxation, concerning the amount of lost profits caused by the defective compressor train. Sterling's testimony was admitted under Rule 701 of the Federal Rules of Evidence. At the time of trial, this Rule read:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Id. Under Rule 701, "a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the jury." United States v. Riddle, 103 F.3d 423, 428 (5th Cir. 1997) (quoting Soden v. Freightliner Corp., 714 F.2d 498, 511 (5th Cir. 1983)). In particular, the witness must have personalized knowledge of the facts underlying the opinion and the opinion must have a rational connection to those facts. See Robinson v. Bump, 894 F.2d 758, 763 (5th Cir.), cert. denied, 448 U.S. 823 (1990). If these two requirements are met "a layman can under certain circumstances express an opinion even on matters appropriate for expert testimony." Soden, 714 F.2d at 511 (citations omitted).

23

Dresser contends that Sterling has no personal knowledge regarding (1) whether, or in what amount, MCC lost ammonia production; (2) the best method for determining lost ammonia production; and (3) the profits lost because of the malfunctioning compressor train. As a consequence, Dresser argues that the district court should not have allowed Sterling to testify about the lost profits caused by the defective compressor train.

Other circuits that have addressed this question have allowed lost profit testimony by a layperson witness if the witness has direct knowledge of the business accounts underlying the profit calculation. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993)(allowing Rule 701 testimony by the owner of a corporation as to the amount of lost profits); In re Merritt Logan, Inc., 901 F.2d 349, 359 (3d Cir. 1990)(allowing Rule 701 testimony by the principal shareholder of the plaintiff concerning that company's lost profits); Teen-Ed, Inc. v. Kimball International, Inc., 620 F.2d 399, 403 (3d Cir. 1980)(allowing testimony by the plaintiff's accountant and bookkeeper regarding lost profits); Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 265 (2d Cir. 1995) ("[A] president of a company, such as Cook, has 'personal knowledge of his business . . . sufficient to make . . . him eligible under Rule 701 to testify as to how lost profits could be calculated.'")(internal citations and quotation marks omitted), cert. denied, 516 U.S. 1114 (1996).

Here, Sterling had previously -- for insurance purposes -- computed lost profits resulting from other slowdowns at the ammonia plant. Furthermore, the production figures (both actual and expected) at the core of Sterling's damage computation were entered into evidence from other sources. On cross-examination, Dresser had the opportunity to challenge these figures as well as Sterling's credibility and methodology. See Teen-Ed, 620 F.2d at 403 ("The modern trend favors the admission of [lay] opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination."). As we have already noted, the way that Sterling computed the damages in this case complied with the three requirements for the award of lost profits under Mississippi law. Furthermore, Sterling had personal knowledge of MCC's books because he had previously done lost profits calculations for MCC for insurance purposes. The extent of Sterling's knowledge is similar to the knowledge of the witnesses testifying to lost profits in Lightning Lube, In re Merritt, Teen-Ed, and Securitron. We see no need to depart from the reasoning of our sister circuits on this issue. Accordingly, we hold that the district court did not abuse its discretion when it allowed Sterling's testimony about lost profits.

IV

In sum, we hold that (1) the statute of limitations does not bar MCC's cause of action because it is alternatively based on a

25

breach of the limited remedy to repair and replace the compressor train; (2) the contractual terms of the warranty do not bar MCC's breach of the express warranty claim; (3) MCC provided sufficient notice to trigger liability under both the terms of the express warranty and the default notice provision of the Mississippi UCC; (4) the damage award calculation was not, as a substantive matter, incorrect because the award put MCC in the same position it would have been in but for Dresser's breach; and (5) Sterling had sufficient knowledge of MCC's underlying business accounts to testify under Rule 701 about lost profits.

In addition, we have carefully examined the remaining arguments for reversal or a new trial advanced by Dresser and find them unpersuasive.

Accordingly, the district court's judgments denying (1) Dresser's motion for judgment as a matter of law and (2) its motion for remittitur or a new trial are

AFFIRMED.